Peter Strojnik, 6464
THE LAW FIRM OF PETER STROJNIK
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-297-3176
E-mail: Strojnik@aol.com
Attorney *pro hac vice* for Defendant/Counterclaimant

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| California Banker's Association, a California Non-Profit Corporation and Banker's Benefit, a California Corporation,<br><br>　　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>TranSend International, Inc., an Arizona Corporation,<br><br>　　　　　　　　　　Defendants.<br><br>TranSend International, Inc., an Arizona Corporation,<br><br>　　　　　　　　　　Counterclaimant,<br>vs.<br>California Banker's Association, a California Non-Profit Corporation and Banker's Benefit, a California Corporation,<br><br>　　　　　　　　　　Counterdefendant. | NO. 07-6330<br><br>ANSWER AND COUNTERCLAIM |

-1-

Defendant/Counterclaimant TranSend International, Inc. admits, denies and alleges as follows:

## ANSWER TO PLAINTIFF'S COMPLAINT

1. Answering the allegations contained in paragraphs 1 and 2, Defendant admits the same.

2. Answering the allegations contained in paragraph 4, Defendant admits that the parties entered into an Endorsement and Marketing Agreement. Defendant denies that the Agreement was attached to Plaintiffs Complaint. Defendant affirmatively alleges that the Endorsement and Marketing Agreement which is appended hereto as Exhibit 1 speaks for itself.

3. Answering the allegations contained in paragraphs 5 and 6, Defendant denies the same.

4. Answering the allegations contained in paragraph 7, Defendant admits that a dispute resolution part of the Agreement provides as follows:

> 15. <u>Dispute Resolution</u>. Except as permitted in Paragraph 14 pertaining to injunctive relief for unauthorized use of CBA's name and logo, in which instance CBA may avail itself of both injunctive relief and the procedures described in this paragraph, any controversy or claim arising out of or relating to this Agreement, or the breach of any provision thereof, shall be settled through mediation. The mediation proceedings shall be conducted at any place that may be selected by mutual agreement of the parties, costs to be borne by the respective parties.

5. Answering the allegations contained in paragraph 8, Defendant denies the same and affirmatively alleges that Defendant offered to mediate both in Phoenix, Arizona, and in Las Vegas, Nevada, but Plaintiffs refused to so mediate.

6. Answering the allegations contained in paragraphs 11 and 12, Defendant denies the same.

7. Defendant denies each and every allegation not specifically admitted herein.

## COUNTERCLAIM

8. Counterclaimant realleges all admissions and denials set forth above.

9. Plaintiffs are California entities as admitted in Plaintiff's Complaint. Plaintiffs conduct their business in the State of California.

10. Counterclaimant is an Arizona Corporation authorized to and conducting its activities in Maricopa County, State of Arizona.

11. The United States District Court for the Northern California District has jurisdiction over this matter by virtue of U.S.C. 28-1331.

12. Venue is proper pursuant to 28 U.S.C. 1391 for the reason that a substantial part of the acts and omissions complained of herein occurred within the Northern California District.

13. Effective on or about December 31, 2006, the parties entered into an Endorsement and Marketing Agreement a true and complete copy of which is appended hereto as Exhibit 1.

14. The parties contemplated that Counterdefendants would perform marketing and marketing related services for Counterclaimant which would result in sales of Counterclaimant product to California Banks in gross amounts no less than $3,000,000 during the first year; no less than $4,000,000 during the second year and no less than $5,000,000 during the third year. Relevant portion of the Agreement provides:

5. <u>License and Marketing Fees</u>. Vendor shall pay to CBA and Banker Benefits as licensing and marketing fees the following amounts:

   (i) Three Hundred Thousand Dollars ($300,000) during the first year (12 months) of this Agreement, Four Hundred Thousand ($400,000) during the second year, and Five Hundred Thousand ($500,000) during the third year; plus

   (ii) Ten percent (10%) of net sales revenues from sales of Services to CBA member banks to be applied against the payments specified in (i) above. The term "net sales revenues" means the gross sales revenues actually received by Vendor and deducting therefrom the (a) the costs of such sales and further deducting (b) the costs of License and Marketing Fees and further deducting therefrom (c) the fees referenced in Paragraph 7 below.

15. The source for the marketing fees was contemplated to be derived from the services promised by Counterdefendants, including, but not necessarily limited, to the following services:

**Attachment B**

Marketing Plan

Banker Benefits shall undertake the following to promote the Services:

- Issue a press release to announce the endorsement
- Provide an enhanced listing in our on-line and *California Banker* Resource Directory
- Provide a full page ad in three editions of the *California Banker* at CBA expense
- Provide a 20% discount for *California Banker* bimonthly magazine advertising
- Provide exhibitor booth at CBA Annual Meeting and one other CBA (non co-endorsed) event.
- Provide 20% discount on exhibits and sponsorship opportunities
- Provide opportunities to submit articles for Monday Courier/Website
- Provide opportunities to submit speakers at conferences
- Sponsor annual promotional Teleconference or Webinar
- Use of CBA Best-in-Category Partner Logo
- Promote through email to CBA contacts
- Use best efforts to promote the Service through face-to-face visits with financial institutions.

16. Counterdefendants have failed to abide by the terms of the agreement, and have failed to provide the services agreed upon.

17. The Agreement further provided that:

> (iv) In the event that Vendor's sales fall below the amount necessary to generate payments referenced in Paragraph 5(i) above by 50% or more in any particular year, then Vendor shall have the option to terminate this Agreement without any further liability or obligation, except that CBA and Banker's benefits shall be entitled to payment Licensing and Marketing Fees arising out of sales of Services to customers existing at the end of such year.

18. Counterclaimant has not terminated the Agreement to date.

19. The parties further agreed to resolve their disputes through an agreed upon mediation. The Agreement provides, in relevant part:

> 15. <u>Dispute Resolution</u>. Except as permitted in Paragraph 14 pertaining to injunctive relief for unauthorized use of CBA's name and logo, in which instance CBA may avail itself of both injunctive relief and the procedures described in this paragraph, any controversy or claim arising out of or relating to this Agreement, or the breach of any provision thereof, shall be settled through mediation. The mediation proceedings shall be conducted at any place that may be selected by mutual agreement of the parties, costs to be borne by the respective parties.

20. Counterclaimant offered to mediate in Phoenix or in Las Vegas (as a mid point between the offices of Counterclaimant and Counterdefendants), but Counterdefendants refused to mediate.

21. Counterclaimant has been damaged by Counterdefendants' breaches of contract.

## COUNT ONE
### (Enforcement of Mediation Provision)

22. Counterclaimant realleges all allegations heretofore set forth.

23. Counterclaimant is entitled to a mediation of the dispute between the parties. Counterclaimant is entitled to have Counterdefendants acting with good faith and fair dealing, and, at a minimum, for an order that the parties mediate their dispute at a location between the location of the parties' offices, as previously suggested and agreed to by Counterclaimant, to wit: Las Vega, Nevada.

WHEREFORE, Counterclaimant seeks judgment as follows:

A. For an order compelling Counterdefendants to mediate the dispute between the parties in Las Vegas, Nevada; and

B. For costs and attorney's fees incurred in this action; and

C. For such other and further relief as the Court may deem just and proper.

## COUNT TWO
### (Breach of Contract)

24. Counterclaimant realleges all allegations heretofore set forth.

25. Count Two is brought in the alternative.

26. Counterdefendants' breach as described above caused Counterclaimant damage in an amount to be proven at trial, but in no event less than $3,000,000 during the first year; no less than $4,000,000 during the second year and no less than $5,000,000 during the third year.

27. Counterdefendants breached the implied covenant of good faith and fair dealing as stated above.

28. Counterclaimant has been damaged by Counterdefendants' breach of contract and the implied covenant of good faith and fair dealing.

WHEREFORE, Counterclaimant prays for judgment as follows:

A. For damages in an amount to be proven at trial, but in no event less than $3,000,000 for damages during the first year of the Agreement; no less than $4,000,000 during the second year and no less than $5,000,000 during the third year; and

B. For costs and attorney's fees; and

C. For pre and post judgment interest on all amounts; and

D. For such other and further relief as the Court may deem just and proper.

RESPECTFULLY submitted this 10th day of December, 2007.

*/s/ Peter Strojnik*
Peter Strojnik
Attorney *pro hac vice* for
Defendant/Counterclaimant

# CERTIFICATE OF SERVICE

The original of the foregoing mailed this 10th day of December, 2007, to the Clerk of the United States District Court For the Northern District of California

Copies mailed to:

William L. Stern, Esq.
Morrison & Foerester LLP
425 Market Street
San Francisco, California 94105-2482
*And by e*-mail: wstern@mofo.com
Counsel for Plaintiff

And to:

Leland Chan, Esq.
Senior Vice President and General Counsel
California Banker's Association
1303 J. Street, Suite 600
Sacramento, California 95814-2939
*And by e-mail*: lchan@calbankers.com
Counsel for Plaintiff

_____

*Exhibit 1*

## ENDORSEMENT AND MARKETING AGREEMENT

This Endorsement and Marketing Agreement ("Agreement") is effective as of the 31 day of December, 2006 ("Effective Date") by and between TranSend International, Inc., an Arizona Corporation ("Vendor"); California Bankers Association, a California nonprofit corporation ("CBA"), and Banker Benefits, a California corporation and wholly-owned subsidiary of CBA.

### RECITALS

WHEREAS, CBA is a nonprofit trade association established in 1891 whose members include most of the FDIC insured depository institutions operating in the State of California, and Banker Benefits is its for-profit, wholly-owned subsidiary providing products and services to CBA member institutions; and

WHEREAS, TranSend is an Arizona Corporation providing Smart Card software, security and convenience software services and products described more fully in Attachment "A" hereto ("Services"); and

WHEREAS, the CBA has determined that TranSend Services are best suited for the applicable banking needs of its member banks, and deserving of endorsement by the CBA to its bank members and others; and

WHEREAS, the Parties desire that TranSend Product be marketed and promoted to banks doing business in California and that TranSend be granted a limited license to use CBA's name and logo in connection with such efforts.

THEREFORE, for valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

1. **Exclusive Endorsement.** CBA hereby endorses TranSend as "Best-In-Category" endorsed partner. CBA shall list TranSend as "Brest-In-Category" endorsed partner on its website and any other media that lists CBA's endorsed partners. TranSend acknowledges and agrees that, during the term of this Agreement, CBA may enter into endorsement agreements with other vendors. However, unless the Parties explicitly agree in advance, during the term of this Agreement, (a) CBA shall not license the CBA name or logo to another entity, or endorse products or services, determined by CBA in good faith to be in competition with TranSend Services, except that acceptance of exhibitor fees at CBA conferences, or paid advertising or sponsorships in any CBA publications or events shall not be construed as endorsement or promotion; and (b) TranSend shall not obtain the endorsement of, or be endorsed by, another organization domiciled in California whose membership consists primarily of financial institutions operating in California. During the term of this Agreement, TranSend shall maintain an affiliate membership with CBA at the regular membership rate subject to CBA board approval.

2. **CBA License.** CBA hereby agrees to license the use of its name and logo during the effectiveness of the Agreement for use by Vendor in marketing the services described in Attachment A hereto ("Services"), which is incorporated by reference into this Agreement. No other representation, express or implied, of CBA's endorsement may be made in connection with any other product or service offered by Vendor, or by any affiliate, parent company, or subsidiary of Vendor, or in any state other than California. Thus, for example, CBA's name and logo may not be incorporated generally into Vendor's letterhead or business cards to the extent that an inference may be reasonably made that Vendor's products and services not specifically endorsed hereby are CBA endorsed, nor may this license be used in a manner that implies that the employees, principals, directors, agents, contractors or other representatives of Vendor are employees or agents of, or otherwise represent CBA or Banker Benefits. All materials, including electronic representations, making reference to CBA's endorsement shall be in a form acceptable to Banker Benefits and CBA. Promotional materials created by Banker Benefits related to the Service shall be in a form acceptable to Vendor and CBA.

3. **Offer of Services.** During the term of this Agreement, Vendor shall make the Services available to California banks which are members of the CBA under similar terms and conditions as that being offered by Vendor to other banks and savings associations located in the United States of America which are not covered by this agreement, except that a discount of twelve and one-half percent (12.5%) off the best price for those Services shall be provided during the term of this Agreement. The parties agree that the Services shall be initially made available to CBA members at the discount rate of $1.75 per individual user per year, excluding any device cost, servers, and engineering fee(s). This amount ($1.75) is after calculating the above referenced 12.5% discount and is exclusive of any volume discounts arranged between Vendor and specific CBA members with the written approval of the CBA. Any other modification of the price or terms may be made only with the prior written consent of Banker Benefits.

4. **Promotion and Marketing.** Banker Benefits shall promote the Service to California banks, and Vendor shall participate in such promotion, both in accordance with the terms and conditions of the Marketing Plan attached hereto as Attachment B and incorporated by reference into this Agreement.

5. **License and Marketing Fees.** Vendor shall pay to CBA and Banker Benefits as licensing and marketing fees the following amounts:

    (i) Three Hundred Thousand Dollars ($300,000) during the first year (12 months) of this Agreement, Four Hundred Thousand ($400,000) during the second year, and Five Hundred Thousand ($500,000) during the third year; plus

    (ii) Ten percent (10%) of net sales revenues from sales of Services to CBA member banks to be applied against the payments specified in (i) above. The term "net sales revenues" means the gross sales revenues actually received by Vendor and deducting therefrom the (a) the costs of such sales and further deducting (b) the costs of License and Marketing Fees and further deducting therefrom (c) the fees referenced in Paragraph 7 below.

    (iii)    One half of the Licensing and Marketing Fees represents CBA's licensing fees and one half represents Banker Benefits' marketing fees; however, Vendor may issue one check payable to Banker Benefits, which shall then distribute one half to itself and the other half to CBA.

    (iv)    In the event that Vendor's sales fall below the amount necessary to generate payments referenced in Paragraph 5(i) above by 50% or more in any particular year, then Vendor shall have the option to terminate this Agreement without any further liability or obligation, except that CBA and Banker's benefits shall be entitled to payment Licensing and Marketing Fees arising out of sales of Services to customers existing at the end of such year.

    (v)    Vendor makes present commitment to pay the sum of $25,000.00 upon invoicing by CBA. This sum shall be offset against the first 12 months payment of $300,000.00 referenced in paragraph 5(i) above.

6. **Payment.** Payments pursuant to paragraph 5 above shall be made by Vendor quarterly no later than fifteen (15) business days from the date of the accounting required to be provided pursuant to Paragraph 8 below.

7. **Joint-Endorsements.** CBA and Banker Benefits shall have the exclusive right to enter into agreements with financial services trade associations in other States whereby the Services are marketed to such other associations' members. Any sales generated under such agreements shall be subject to the 10% fee set forth in Paragraph 5 above, which fees shall also count against the annual payment pursuant to Paragraph 5(i). Banker Benefits shall be solely responsible for any revenue sharing with such other association, and Vendor shall have no obligation or right to communicate directly with any other association in connection with the sale of the Service. Vendor's obligation to pay fees on sales made to or through other associations is conditioned upon such other association entering into an agreement with Banker Benefits for the promotion of the Service, except that Vendor shall have no obligation to pay such fees in connection with a sale of a Service to an entity (i) that is an existing customer of Vendor prior to the effectiveness of this Agreement, or (ii) with whom Vendor has had, prior to a sale otherwise subject to this Agreement, direct and substantial communications for the prospective sale of the Service; provided further that the entity described in (i) or (ii) is included in a list provided to Banker Benefits as of the effective date of this Agreement.

8. **Accounting and Auditing.** Within 15 days following the end of each calendar quarter during the term of this Agreement, Vendor shall provide Banker Benefits with a report, in a form that is mutually agreed to by the parties, identifying all sales activities for which licensing and marketing fees are payable during such month quarter. The report shall provide, at the minimum, the identity of the financial institutions that have purchased one or more Services, the revenues collected by Vendor, and the fees payable under this Agreement. Vendor agrees to provide such other information as Banker Benefits reasonably requests from time to time consistent with the purposes of this Agreement, including without limitation financial reports indicating Vendor's financial condition. Banker Benefits shall have the right on an annual

basis to request other information from Vendor necessary to assure complete accounting of sales and fees, and further to assure Vendor's maintenance of adequate reporting, product service levels, or related purposes, as Banker Benefits deems reasonably necessary.

9. <u>Term</u>. The initial term of the Agreement shall be for three years; thereafter this Agreement shall automatically renew for successive one-year periods until either party delivers to the other, not less than thirty (30) days prior to the expiration of the then current term, written notice of its intent not to renew the Agreement. This Agreement may be terminated by either party for cause. The term "for cause" shall mean any of the following acts or omissions which shall remain uncured for a period of sixty days following written notice by the alleging party: (a) the material failure of a party to perform any of its duties and obligations hereunder; or (b) any act or omission by Vendor which, in the reasonable good faith judgment of CBA or Banker Benefits, is materially detrimental to Banker Benefits, CBA or its members; (c) any act or omission by CBA or Banker Benefits which in the reasonable good faith judgment of Vendor is materially detrimental to Vendor. The term "for cause" shall also mean the filing by a party of any petition or institution of any proceedings under the Federal Bankruptcy Act or any other similar acts, pursuant to which a party seeks to be adjudicated as bankrupt or to be discharged from any of its debts or obligation, or to effect an extension of time to pay its debts, or for a readjustment of a party's debts, or for any similar relief, which is not discharged within sixty (60) days thereafter, or if a party makes a general assignment for the benefit of its creditors.

10. <u>Assignment</u>. No party to this Agreement may assign the Agreement or delegate any of its obligations hereunder (except in the normal course of business) without the prior written consent of the other party. This limitation of assignment shall not apply to any assignment to a successor to a party either by a merger or acquisition or formation of a new subsidiary, provided that such successor has the powers and capabilities as are necessary to perform the duties of the assigning party.

11. <u>Confidential Information</u>. The parties agree that all information and documents furnished to each other which are communicated, whether in writing or not, as confidential, shall be received as a confidential disclosure, and that the receiving party shall not use or disclose to any other person during or after the term of this Agreement any such information or documentation without the express written consent of the disclosing party.

12. <u>Rights at Termination</u>. No later than 30 days after termination of this Agreement for any reason: Vendor shall (i) tender to Banker Benefits all amounts accrued and unpaid during the term of the Agreement; (ii) furnish to Banker Benefits a list of all California banks to whom Services had been provided during the term of the Agreement; and (iii) in consideration of the goodwill that will have generated to Vendor derived from CBA's endorsement that will extend beyond the expiration or termination of this Agreement, for an additional six months commencing upon the date of expiration or termination, provide to Banker Benefits 10% of gross revenues for Services sold to California banks during such six month period in the same manner and under the same terms as if Paragraphs 5, 6 and 8 of this Agreement were still in effect. Upon termination of this Agreement, Vendor shall cease distributing any materials or making any oral, written, electronic or any other type of representations indicating CBA's endorsement. This paragraph is subject to Paragraph 5(iv).

13. <u>Remedies</u>. In the event this Agreement is terminated, Vendor acknowledges that its failure to promptly discontinue promotion of the Service as an endorsed service or its failure to promptly discontinue use of the CBA name or logo will result in immediate and irreparable damage to CBA and Banker Benefits. Vendor acknowledges and admits that there is no adequate remedy at law for such failure to terminate promotion and use of CBA's name and logo and agrees that in the event of such failure, CBA and Banker Benefits shall be entitled to equitable relief by way of temporary and permanent injunctions and such other and further relief as any court with competent jurisdiction may deem just and proper.

14. <u>Indemnity</u>. Vendor shall hold CBA and Banker Benefits, its officers, directors, employees, agents and successors harmless and indemnify the same from and against any third-party claims, expenses, damages, judgments and costs, including attorneys' fees, arising from or related to the Services except to the extent a claim is the result of the negligence or intentional misconduct of CBA or Banker Benefits. CBA and Banker Benefits shall hold Vendor, its officers, directors, employees, agents and successors harmless and indemnify the same from and against any third-party claims, expenses, damages, judgments and costs, including attorneys' fees, arising from or related to the Services except to the extent a claim is the result of the negligence or intentional misconduct of Vendor. Vendor also agrees to hold CBA and Banker Benefits, its officers, directors, employees, agents and successors harmless and indemnified from and against any third party claims, expenses, damages, judgments and costs, including attorneys' fees, alleging that the Services constitute an infringement of any United States patent, copyright or trade secret.

15. <u>Dispute Resolution</u>. Except as permitted in Paragraph 14 pertaining to injunctive relief for unauthorized use of CBA's name and logo, in which instance CBA may avail itself of both injunctive relief and the procedures described in this paragraph, any controversy or claim arising out of or relating to this Agreement, or the breach of any provision thereof, shall be settled through mediation. The mediation proceedings shall be conducted at any place that may be selected by mutual agreement of the parties, costs to be borne by the respective parties.

16. <u>Representations</u>. Vendor represents that it is in compliance with all applicable federal, state and local laws and regulations; that any licenses or certifications which may be required by law have been obtained; that Vendor is a corporation in good standing with all applicable federal, state, and local regulatory agencies; and that it has all rights to the Service and that it is in conformity with the standards and qualities of its industry.

17. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of California.

18. <u>Relationship</u>. The rights and obligations between Vendor, CBA, and Banker Benefits as described herein shall not be construed to create among the parties a partnership, joint venture, agency, employment or any other relationship of any kind other than that which is narrowly defined herein.

19. <u>Severability</u>. In the event that any portion of this Agreement shall be held to be invalid or otherwise contrary to law, the remaining provisions shall remain in full force and effect

unless the portion of this Agreement held to be invalid or contrary to law materially (i) alters the obligations of the parties hereunder; or (ii) impairs the rights of any Party to receive the benefits that flow from this Agreement.

20. <u>Waiver</u>. The waiver by either party of a default or breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent default or breach.

21. <u>Notices</u>. Notices to the respective parties shall be provided as follows:

Banker Benefits
Attn: Linda Iben
1303 J Street, Suite 600
Sacramento, CA 95814

TranSend International, Inc.
ATTN: Eric Atencio
4710 Falcon Drive, Suite 215
Mesa, Arizona 85215

California Bankers Association
Attn: Bill Murphy
1303 J Street, Suite 600
Sacramento, CA 95814

22. <u>Entire Agreement</u>. This Agreement (a) represents the entire agreement of the parties with respect to the subject matter hereof and (b) may not be modified except in writing duly executed by each party.

IN WITNESS WHEREOF, this Agreement is entered into as of the date first appearing above by CBA, Banker Benefits, and Vendor.

TRANSEND INTERNATIONAL, INC.

By: _Donald Teague_
Chairman of the Board and
Authorized representative

CALIFORNIA BANKER'S ASSOCIATION

By: _William J. Murphy_
_Sr Vice President_ and
Authorized representative

BANKER'S BENEFITS

By: _Janet Lamkin_
_President and CEO_ and
Authorized representative

Page 6 of 9

*Left Blank on Purpose*

**Attachment A**

Description of Services

The Service described in this Agreement is the PocketServer™ Software for the use in Smart Cards and/or the PocketServer™ PLUS software licensing solution for banks, savings associations and credit unions, which authenticates user to institution and institution to user, using "two-way, two-factor authentication" protocols. PocketServer™ PLUS has the potential to incorporate a third and fourth factor of authentication, which can include biometrics with pulse or can be heat delivered through emerging smart card technologies. PocketServer™ PLUS current technology includes Vendor's secure convenience and storage tools on a smart card chip, including: passwords, URL's, form fill, multi-factor authentication and other web convenience tools.

## Attachment B

## Marketing Plan

Banker Benefits shall undertake the following to promote the Services:

- Issue a press release to announce the endorsement

- Provide an enhanced listing in our on-line and *California Banker* Resource Directory

- Provide a full page ad in three editions of the *California Banker* at CBA expense

- Provide a 20% discount for *California Banker* bimonthly magazine advertising

- Provide exhibitor booth at CBA Annual Meeting and one other CBA (non co-endorsed) event.

- Provide 20% discount on exhibits and sponsorship opportunities

- Provide opportunities to submit articles for Monday Courier/Website

- Provide opportunities to submit speakers at conferences

- Sponsor annual promotional Teleconference or Webinar

- Use of CBA Best-in-Category Partner Logo

- Promote through email to CBA contacts

- Use best efforts to promote the Service through face-to-face visits with financial institutions.